# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 10, 2025

Lyle W. Cayce
Clerk

No. 24-50621

United States of America,

*Plaintiff—Appellee,*

*versus*

Rafael Moises Silva,

*Defendant—Appellant.*

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 7:24-CR-9-2

_____

Before Elrod, *Chief Judge,* and King and Graves, *Circuit Judges.*
Per Curiam:[*]

Rafael Moises Silva pleaded guilty to conspiracy and possession with intent to distribute cocaine. Silva now appeals his sentence, arguing that the district court erred in holding him accountable for cocaine found in his co-conspirator's house, and sold in two transactions handled by his co-conspirators. We AFFIRM.

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 24-50621

## I.

## A.

Defendant-Appellant Rafael Moises Silva pleaded guilty to conspiring with two others to possess cocaine with intent to distribute, and to possessing cocaine with intent to distribute. We derived the following facts from the factual basis supporting Silva's guilty plea, testimony given by Sergeant Tyler Rodgers at Silva's sentencing hearing, and the Presentence Investigation Report (PSR).

Silva's conviction arose from a series of controlled drug buys executed by Odessa Police Department Detectives using an informant over a two-month period in 2023. In each of five transactions, the informant arranged to purchase about 28 grams of cocaine from Silva's co-conspirator Melvin Galeas. In the first transaction, on October 25, 2023, the informant received the cocaine directly from Galeas. In the second, Daniel Ramon, one of Silva's co-conspirators, delivered the cocaine to the informant at a pre-arranged site. In the third, Silva delivered the cocaine to the informant, identifying himself as "Ramon's homeboy" and roommate, and Galeas's brother-in-law. In the fourth, police conducted surveillance outside Galeas's home and observed Silva arriving at the residence and retrieving cocaine in the front yard before delivering it to the informant.

In the fifth and final transaction, on December 18, 2023, Galeas wanted to be paid before delivering the cocaine and arranged for Silva to pick up $900 in cash from the informant. Police conducting surveillance outside Galeas's home observed that after Silva picked up the cash, he arrived at Galeas's house, went inside for about 10 minutes, walked out, got in his car, and drove away. After Silva left Galeas's house, officers stopped Silva's car for a traffic infraction and found 34.40 grams of cocaine inside the driver's side door.

2

Later that day, detectives executed a search warrant on Galeas's 2800-square-foot house and discovered cocaine, four firearms, and cash. Galeas led detectives to a cabinet in the ceiling of the garage, "kind of like where the attic was." Inside was a cardboard box with 608.29 grams of cocaine. Sergeant Rodgers explained that the cocaine was not well hidden and would be accessible to someone standing on a stool. Galeas told police he had placed the cocaine there.

In an interview at the police station, Galeas told officers that he obtained the cocaine from someone in Dallas and had been distributing it for about three months. Galeas explained that Silva came to him and asked for work related to Galeas's criminal activity. Silva then began distributing cocaine for Galeas and brought in Ramon. According to Rodgers, Galeas began minimizing Silva's involvement later in the interview, stating that Silva "was just a user" and "would never distribute anything more than just a gram or two," and falsely claiming that Silva had sold for him only once. When pressed, Galeas declined to answer further.

There was conflicting evidence about where Silva lived at the time of his arrest: (1) Silva's sister (Galeas's wife) indicated that Silva was living with her and Galeas, (2) Silva told the probation officer he was living with a different sister at a different address, and (3) Silva identified himself as Ramon's roommate. Rodgers acknowledged that each time Silva participated in a controlled purchase, he arrived at Galeas's residence from another location to pick up the cocaine. Rodgers also agreed there was no evidence that Silva had access to the cocaine found in Galeas's attic or that he even knew the stash was there. But Rodgers maintained that Silva had unobstructed access to Galeas's house.

Additionally, Rodgers testified that the relatively low sales price of the cocaine would indicate to its sellers that it came from a large stash, and the

fact that Silva knew where Galeas lived indicated that Galeas trusted him. But Rodgers agreed there was no evidence that Silva "facilitated or participated in []Galeas's acquisition" of the cocaine, and that "the only evidence" of Silva's involvement was that he picked up cocaine from Galeas's house and delivered it. Finally, Rodgers confirmed that "Galeas advised" that he had "outsourced a discrete delivery aspect" of his operation to Silva "to minimize exposure to law enforcement."

**B.**

Silva signed a factual basis, and pleaded guilty to conspiring with Galeas and Ramon to possess cocaine with intent to distribute from October 1 to December 18, 2023 (count 1), and to possessing cocaine with intent to distribute on December 18, 2023 (count 2). In the factual basis, Silva reserved his right to challenge at sentencing the first two transactions and the stash of cocaine found in Galeas's house.

Based on a total quantity of 755.41 grams (the amount involved in the five transactions plus the amount found in Galeas's house), the PSR assessed a base offense level of 24, as the Sentencing Guidelines require when an offense involves between 500 grams and two kilograms of cocaine. U.S.S.G. §§ 2D1.1(a)(5), (c)(8).

Silva filed objections. Relevant here, he argued that his involvement in the conspiracy was limited to distributing cocaine on three discrete occasions. Based on the amount involved in the last three transactions (90.7 grams), Silva advocated for a base offense level of 14, as the Guidelines require when an offense involves between 50 and 100 grams of cocaine. § 2D.1(c)(13). At the sentencing hearing, Silva's counsel reiterated the objections. Considering the PSR, the testimony, and the parties' arguments, the district court found that "Silva is responsible for the entirety of this relevant conduct," that "[t]his was clearly jointly undertaken criminal

activity," and that it was "in furtherance of the conspiracy" and "reasonably foreseeable to [Silva]."

The court went on to explain that it did not "believe that the total that we're talking about here is outside the universe of what Mr. Silva's doing." If the total amount of cocaine had been more, the district court stated it would "start second-guessing" and considering whether "that seems to be way outside the universe of what [Silva] likely knew." To be cautious, the court decided "to sustain the objection only to part of it" and attribute only half (377.5 grams) of the total quantity of cocaine to Silva. That put Silva at a base offense level of 20, as the Guidelines require when an offense involves between 300 and 400 grams of cocaine. § 2D1.1(c)(10). The court subtracted three levels for acceptance of responsibility to arrive at a total offense level of 17, and acknowledged Silva had a criminal history category of IV, resulting in a Guidelines range of 37 to 46 months of imprisonment.

Finally, the district court concluded that the PSR underrepresented Silva's criminal history and found the Guidelines range would not be fair and reasonable. The district court then sentenced Silva to 60 months of imprisonment for each count, to run concurrently with each other and any sentence that might issue from the state charge. Silva timely appealed his sentence.

## II.

"The district court's interpretation or application of the Sentencing Guidelines is reviewed *de novo*, while its factual findings are reviewed for clear error." *United States v. Barfield*, 941 F.3d 757, 761 (5th Cir. 2019) (quoting *United States v. Torres-Hernandez*, 843 F.3d 203, 207 (5th Cir. 2016)). "[T]he 'district court's determination of what constitutes relevant conduct for purposes of sentencing' is a factual finding that 'is reviewed for clear error.'" *Id.* (quoting *United States v. Wall*, 180 F.3d 641, 644 (5th Cir.

1999)). "A factual finding is not clearly erroneous if it is plausible in light of the record as a whole." *Id.* (quoting *United States v. Zuniga*, 720 F.3d 587, 590 (5th Cir. 2013) (per curiam)).

## III.

"A defendant convicted of a drug offense is sentenced based on the amount of drugs involved in the offense." *Barfield*, 941 F.3d at 762 (citing U.S.S.G. § 2D1.1(c)). "[T]he applicable drug quantity includes not only drugs with which the defendant was directly involved, but also drugs that can be attributed to him as part of his 'relevant conduct'" under section 1B1.3(a)(1) of the Guidelines. *United States v. Foy*, 28 F.3d 464 (5th Cir. 1994). "[I]n the case of a jointly undertaken criminal activity," a defendant's relevant conduct includes "all acts and omissions of others that were[] (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B).

The commentary to the Guidelines further explains that "the scope of the 'jointly undertaken criminal activity' is not necessarily the same as the scope of the entire conspiracy," because "a count may be worded broadly and include the conduct of many participants over a period of time." § 1B1.3 cmt. 3(B). Instead, the "accountability of the defendant for the acts of others is limited by the scope of his or her agreement to jointly undertake the particular criminal activity." *Id.* In cases involving controlled substances, "the scope of the jointly undertaken criminal activity . . . may depend upon whether . . . the nature of the offense is more appropriately viewed as one jointly undertaken criminal activity or as a number of separate criminal activities." *Id.*

"Like all factual findings used in sentencing, relevant conduct must be proven by 'a preponderance of the relevant and sufficiently reliable

evidence.'" *Barfield*, 941 F.3d at 762 (quoting *United States v. Alaniz*, 726 F.3d 586, 619 (5th Cir. 2013)). The PSR generally "bears sufficient indicia of reliability to be considered as evidence by the sentencing judge in making factual determinations." *Id.* (quoting *United States v. Nava*, 624 F.3d 226, 231 (5th Cir. 2010)).

Silva contends the district court clearly erred in finding that his relevant conduct extended to (A) the cocaine stored in Galeas's home, and (B) the cocaine involved in the first two transactions handled by Galeas and Ramon.

**A.**

Silva pleaded guilty to conspiring with Galeas and Ramon, so there is no dispute that he agreed to "jointly undertaken criminal activity." *See* U.S.S.G. § 1B1.3. But Silva argues that the cocaine found in Galeas's house was not within the scope of the *particular* criminal activity Silva agreed to jointly undertake, *see id.* cmt. 3(B), because the "totality of [his] agreement to participate in the conspiracy was to make three deliveries for Galeas."

This court has recognized that "the Sentencing Commission did not intend to hold persons who assist a drug dealer in one transaction responsible for all the drugs sold or possessed by that dealer." *United States v. Smith*, 13 F.3d 860, 867–68 (5th Cir. 1994). But here, there is evidence to support that Silva's involvement extended to the stash of drugs found in Galeas's house. Silva was familiar with and recently visited Galeas's house, sought out drug-related work from Galeas, delivered cocaine for Galeas on multiple occasions, and recruited Ramon to deliver drugs for Galeas. Drawing reasonable inferences, the district court could plausibly find that the cocaine in Galeas's house was within the scope of Galeas, Ramon, and Silva's jointly undertaken criminal activity, in furtherance of that criminal activity, and reasonably

foreseeable by Silva.[1] *See* U.S.S.G. § 1B1.3(a)(1)(B); *see also United States v. Johnson*, 14 F.4th 342, 349–50 (5th Cir. 2021); *United States v. Bravo*, 852 F. App'x 790, 796–97 (5th Cir. 2021) (per curiam).

## B.

Because the district court did not clearly err in finding Silva accountable for the cocaine in Galeas's house, we need not address Silva's challenge to the court's attribution of the relatively small amount of cocaine involved in the first two transactions. Recall that after cutting the total quantity of drugs in half, the district court ultimately found Silva's relevant conduct included 377.5 grams of cocaine, resulting in a base offense level of 20. *See* U.S.S.G. § 2D1.1(c)(10). The first two transactions involved fewer than 60 grams. Therefore, any error with respect to these two transactions would not change Silva's base offense level of 20, which applies to offenses involving between 300 and 400 grams of cocaine. *Id.; see United States v. Roberts*, 594 F. App'x 249, 250 (5th Cir. 2015) (per curiam) (declining to

---

[1] Silva also argues that the district court's explanation for cutting the total drug quantity in half shows the court engaged in impermissible speculation, because its "reasoning seemed to revolve around the idea that the evidence did not fully reflect the extent of Silva's acts." But the district court's comments indicate it was concerned with whether the total amount in Galeas's house was within the "universe" of what Silva "likely knew." And the decision to lower the attributable drug quantity to be more proportional to the amount with which the defendant was directly involved is consistent with this court's precedent considering reasonable foreseeability. *See United States v. Mitchell*, 964 F.2d 454, 460 (5th Cir. 1992) (per curiam) (explaining that while "it is reasonable to infer" the defendant knew his co-conspirators were dealing in amounts larger than a few ounces, "it is quite a leap from one-half a kilogram to 20 kilograms"); *see also United States v. Puig-Infante*, 19 F.3d 929, 942 (5th Cir. 1994) (explaining "sentencing court may make an approximation of the amount of marihuana reasonably foreseeable to each defendant, and an individual dealing in large quantities of controlled substances is presumed to recognize that the drug organization with which he deals extends beyond his 'universe of involvement'" (quoting *United States v. Thomas*, 963 F.3d 63, 65 (5th Cir. 1992))). Accordingly, we decline to find the district court erred in this regard.

No. 24-50621

consider "the attribution of an additional relatively small quantity of heroin ... because, even if successful, it would not affect the calculation of the sentencing guidelines range").

\* \* \*

For the foregoing reasons, the sentence issued by the district court is AFFIRMED.